**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | |
|---|---|
| TYRONE HAMPTON<br><br>Plaintiff,<br><br>v.<br><br>ARNALDO HERNANDEZ, NOM THAI, and BRITNEY TES,<br><br>Defendants. | 3:23-cv-00234-ACP<br><br>**ORDER GRANTING SUMMARY JUDGMENT**<br>[Dkt. 39] |

Tyrone Hampton alleges that three members of the prison staff at Anchorage Correctional Complex violated the Fourteenth Amendment by serving him fish despite his allergy. To survive the pending motion for summary judgment, Hampton had to provide evidence that the Defendants displayed deliberate indifference to a serious medical need. However, he does not raise a genuine dispute of material fact about essential elements of deliberate indifference. Therefore, the Defendants' motion for summary judgment at Docket 39 is **GRANTED**.

## I. BACKGROUND

Hampton was a pre-trial inmate at Anchorage Correctional Complex-West when the events giving rise to this case occurred. He also has a severe fish allergy. (*See* Dkt. 41-7 at 5) Due to his allergy, Hampton was placed on a medical no-fish diet on January 25, 2023. (Dkt. 41-2 at 2) This followed a Department of Corrections policy requiring prisons to

provide inmates with a medical diet when doing so is medically required and prescribed by a healthcare provider. (Dkt. 41-1 at 2)

At Anchorage Correctional, meals are prepared by inmates working under the supervision of kitchen stewards. (*See* Dkt. 41-5 at 2; Dkt. 39 at 69) Meals are then taken to the housing modules and given to the prisoners. (Dkt. 39 at 29-30) Prisoners with special diets are supposed to receive a specific tray labeled with a sticky note including their name, mod, and dietary restriction. (*Id.*) Hampton's trays were labeled "cardiac – no fish." (*Id.*; Dkt. 41-6)

Despite the dietary restriction, he was served fish on three separate occasions.

**A. May 1, 2023.**

Hampton's first exposure to fish at Anchorage Correctional happened on May 1, 2023. He was handed a tray with several fried and breaded nuggets and assumed that they were chicken. (Dkt. 39 at 51; Dkt. 41-4 at 2) His tray included the sticker that said no seafood. (Dkt. 39 at 51; Dkt. 41-4 at 2) However, eating the nuggets made him feel sick. (Dkt. 39 at 51) He then had an allergic reaction requiring him to go medical where he was given Benadryl. (Dkt. 41-4 at 2)

After the incident, Hampton investigated to determine the identity of the chef and was told by a fellow inmate that Nam Thai was responsible for making the trays. (Dkt. 39 at 51) Hampton had no prior relationship with Thai. (*Id.* at 53)

Hampton filed a grievance, and DOC instructed kitchen staff to double check Hampton's food tray before sending it out. (Dkt. 39 at 70) According to DOC, the incident was the result of normal human error that happens when serving food to three to four

hundred people, not malice. (Dkt. 41-4 at 2) DOC also informed Hampton that he should ask for a new tray if he is given food contaminated with an allergen. (*Id.*)

**B. March 12, 2024.**

The second, and most serious, incident happened on March 12, 2024. Food Service Lead, Britney Tes, was working in the kitchen during lunch. (Dkt. 41-5 at 2) Hampton's tray received soup containing fish. According to a later written report by Tes: "As the food line was running for regular trays, I was the one making the diet trays one mod at a time. They are then run thru the line for completion. A kitchen worker accidently putmain [sic] line soup on his tray and it went to the mod." (*Id.*) Hampton, however, believes Tes may have personally prepared his tray with the allergen-containing soup. (*See* Dkt. 41 at 17, 20)

After taking a few bites, Hampton became ill and presented the tray to an officer who confirmed that the soup had fish. (Dkt. 41-5 at 2; Dkt. 39 at 56) Hampton suffered "generalized tingling, chest pains, and the sensation that his throat was closing up." (Dkt. 41-7 at 5) He was sent to medical and was administered Epinephrine because of "his known allergy, his presentation, and a stated history of anaphylaxis." (*Id.*) He was then given Benadryl and dexamethasone before being sent to the emergency room to receive an IV and additional treatment. (*Id.*; Dkt. 41-5 at 2; Dkt. 39 at 57) Hampton was also billed $1242.36 for his hospitalization. [1] (Dkt. 41-9 at 2)

---

[1] Hampton was billed $1242.36 for his hospitalization on March 12, 2024. (Dkt. 41-9 at 2) He claims this is part of the harm he suffered. (Dkt. 41 at 12-13) The Defendants do not dispute that DOC had a duty to pay for Hampton's medical care and state that "[t]he [C]ourt can enter judgment in that amount and the State of Alaska will pay it to Mr. Hampton." (Dkt. 39 at 6) However, neither Alaska nor the DOC are parties to this case, which means that this Court does not have jurisdiction to enter a judgment against them.

Hampton filed a grievance alleging that Tes intentionally tried to harm him. (Dkt. 39 at 75, 77) Hampton's grievance claimed this was a deliberate attempt on his life because he was served contaminated fish multiple times. (*Id.* at 76) After the incident, Tes spoke to her supervisor and made a plan to "make sure this never happens again." (Dkt. 41-5 at 2)

**C. July 31, 2024.**

The final incident occurred on July 31, 2024, when Hampton was exposed to a tray that had touched fish. Before receiving his tray, Hampton noticed that it was sandwiched between two trays containing fish. (Dkt. 39 at 84) He told an officer that his tray had contacted fish. (*Id.*) The officer ordered a new tray, which arrived with an empty "topper" tray covering it. (*Id.*) When Hampton "removed the topper tray, he came in to contact with fish that was stuck on it." (*Id.*) He developed a rash on his arm and he was sent to medical for treatment. (*Id.* at 84-85)

The kitchen manager, another DOC employee not party to this case, confirmed that this incident occurred because there was fish stuck to the topper tray. (*Id.* at 84) She subsequently recommended covering Hampton's tray completely in plastic wrap so that this does not recur. (*Id.*) This recommendation was adopted. (*Id.* at 83) She also asked Hampton to let her know if it ever happened again. (*Id.* at 86)

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the "initial burden of demonstrating the absence of a genuine issue of fact for trial." *Deveraux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). The movant

can meet this burden by showing that the non-moving party lacks evidence for an essential element of their claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once this showing is made, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co*., 391 U.S. 253, 288 (1968)). This burden "is not a light one." *In re Oracle Corp. Sec. Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). It requires doing more than creating "some 'metaphysical doubt' as to the material facts at issue." *Id.* (quoting *Matsushita Elec. Indus Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Conclusory assertions which lack detailed facts and any supporting evidence are insufficient to create a genuine issue of material fact at trial. *F.T.C. v. Pub'l Clearing House*, 104 F.3d 1168, 1171 (1997). Rather, the non-moving party must provide sufficient evidence for a reasonable jury to find in their favor. *Anderson*, 477 U.S. at 252.

At this stage of the case, the evidence and "facts must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. ANALYSIS

### A. Hampton must prove that the defendants acted with deliberate indifference to a serious medical need.

The Due Process Clause of the Fourteenth Amendment provides pre-trial detainees with the right to medical care. *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002). Prison officials violate this right when they display deliberate indifference to a detainee's serious medical needs. *Id.* These claims are evaluated under an objective

standard. *Gordon v. County of Orange,* 888 F.3d 1118, 1124-25 (9th Cir. 2018). Under this standard, the detainee must prove that the defendant acted with "more than negligence but less than subjective intent—something akin to reckless disregard." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

A claim of deliberate indifference to serious medical needs has four elements:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon I*, 888 F.3d at 1125.

An "intentional decision," is a deliberate choice, that is a purposeful or knowing decision, about the conditions of the detainee's confinement. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015). A deliberate choice can include a failure to act. For example, a prison official can be liable for "standing idly by" despite being aware that an inmate is suffering from an acute medical condition. *Sandoval v. County of San Diego*, 985 F.3d 657, 680 (9th Cir. 2021). Likewise, a prison official can also be liable for failing to check on an inmate whose "presentation indicates the need for medical treatment." *Gordon v. County of Orange*, 6 F.4th 961, 970 (9th Cir. 2021) (*Gordon II*).

A serious risk of medical harm exists where there is a "'serious medical need' such that a 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Russell*, 31 F.4th at 739 (quoting *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc)). This is an objective standard that is satisfied if there is "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014))

The third element is met when the defendant's conduct was "objectively unreasonable" which "'turn[s] on the facts and circumstances of each particular case.'" *Castro,* 833 F.3d at 1071 (quoting *Kingsley*, 576 U.S. at 397). Since this is an objective inquiry, the detainee does not have to prove that an officer subjectively knew their action or inaction would place them at a serious risk of substantial harm. *Russell*, 31 F.4th at 739. Instead, a plaintiff must show that "a reasonable official in his circumstances would have drawn that inference." *Id.* Additionally, medical negligence, by itself, is insufficient to establish that the official was deliberately indifferent. *Id.* at 741.

Lastly, causation requires the detainee to show that the defendant either personally participated in the deprivation or set a series of events in motion that they reasonably should have known would cause the constitutional injury. *See Chaudry v. Aragón*, 68 F.4th 1161, 1170-71 (9th Cir. 2023). This inquiry "must be individualized and focus on the duties and responsibilities of each defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

## B. Hampton failed to support essential elements of his claim against each Defendant.

Hampton's case cannot survive summary judgment because he lacks enough evidence to raise a genuine issue of material fact about essential elements of his claim. *Celotex*, 477 U.S. at 323. The parties seem to agree that Hampton met his burden with respect to second element of his claim as the Defendants do not address this element in their motion. (*See* Dkt. 39) However, Hampton has failed to raise a genuine dispute of material fact about other elements of his claim for each defendant.

### 1. Nom Thai is entitled to summary judgment.

Hampton cannot raise a genuine dispute of material fact about the first element of his claim against Thai.

Hampton asserts that Thai was responsible for serving him fish on May 1, 2023. He does not cite any factual support in his brief. (*See* Dkt. 41 at 10), His argument appears to be based on facts that he asserted in his deposition: he was served fish multiple times, Thai prepared the May 1 tray, and Thai later wrote to Hampton saying that "people are human, they make mistakes." (*Id.* at 52-53; Dkt. 41 at 10)

This claim fails at the first element. The record does not allow an inference that Thai intentionally served Hampton fish despite recognizing his allergy. *See Castro*, 833 F.3d at 1072-73 (analyzing the decision to place plaintiff in a cell with a man that defendants "knew…was enraged and combative"). Hampton cites no evidence indicating that Thai saw the fish allergy label or knew he was placing fish on Hampton's tray. Thus, there is no factual support to conclude that Thai intentionally served Hampton a known allergen. In

contrast, DOC's uncontroverted investigation concluded that Hampton received fish nuggets due to "human error." (Dkt. 41-4 at 2) The report further explained that "[w]hen serving 300-400 people, it is likely that mistakes will occur." (*Id.*)

One single incident of mistaken allergen exposure when preparing food for several hundred people amounts to mere negligence. This means it is insufficient to recover under a claim of deliberate indifference to medical needs. *Kingsley*, 576 U.S. at 396 ("liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process.") (*emphasis in original*). This also defeats Hampton's claim under the third element. *Russell*, 31 F.4th at 740 (holding that "medical negligence is not by itself unconstitutional.")

Therefore, Thai is entitled to summary judgment.

**2. Britney Tes is entitled to summary judgment.**

Hampton also cannot raise a genuine dispute of material fact about the third element of his claim against Tes.

Hampton argues that Tes is responsible for his March 12 exposure because she prepared the diet-restricted meals that day and was aware of his previous allergy attacks and previously sent him trays containing fish. (*See* Dkt. 41 at 11, 17, 25; Dkt. 39 at 75-77) Hampton also alleges that Tes personally put the soup on his tray, but this claim is contradicted by the record. (*See* Dkt. 39 at 58; Dkt. 39 at 69)

The record does allow an inference that Tes was aware of Hampton's allergy and oversaw his meal preparation on March 12. Hampton provided a collection of allergen notes that Tes wrote and attached to his trays. (Dkt. 41-6 at 2) And in her memorandum,

Tes acknowledged that on March 12 she was making the diet trays before they were "run thru the line for completion." (Dkt. 41-5 at 2) While not totally clear, this suggests that Tes delegated the actual placement of food on the trays to kitchen workers, and that a kitchen worker accidently put fish soup on Hampton's tray when Tes sent it through the line. (*Id.*) Thus, Hampton challenges Tes's intentional decision to delegate tray assembly to other kitchen staff, despite knowing he had an allergy. (Dkt. 41 at 11)

This claim against fails under the third element. There is simply no evidence showing that Tes, specifically, failed to take reasonable precautions. Instead, Tes took "reasonable available measures to abate the risk" by placing the allergen note on Hampton's trays. (*See* Dkt. 41-6 at 2) It would not be obvious to a reasonable official in Tes's position that a worker would place the wrong food on an allergen tray. At worst, the mistake would amount to medical negligence. But that is not sufficient to sustain a claim of deliberate indifference. *Russell*, 31 F.4th at 740.

Hampton's claim may be stronger if he provided evidence that Tes was involved in a previous incident. But this allegation is only supported by unsubstantiated accusations. (*See* Dkt. 39 at 75-77) His only evidence of a prior exposure involved Thai ten months previously. And Tes's uncontroverted memo explains that after this incident, she personally took steps to prevent it from happening again.[2] (Dkt. 41-5 at 2)

---

[2] Additionally, insofar as Hampton relies on DOC's policy manual to show that Tes's actions were unreasonable, Hampton is misinterpreting the meaning of "cross-check" in DOC policy. The cited provision is about cross-checking existing special diets against new requests, not procedures to prevent allergen exposure. (See Dkt. 41-1 at 5)

Finally, Hampton argues that a video recording of the kitchen on March 12, 2024, would produce evidence supporting his claim against Tes. (*See* Dkt. 41 at 14) He asked DOC to preserve that footage, but they inadvertently preserved footage from a different date. (*See* Dkt. 41-11 at 2) According to Hampton, this means he is entitled to a presumption that the lost recordings were unfavorable to the Defendants. (Dkt. 41 at 15) However, Hampton was given an opportunity to develop that evidence through depositions, and he chose not to. (*See* Dkt. 57; Dkt. 61) Since he was given an opportunity for additional discovery, Hampton is not entitled to a presumption that the evidence would weigh in his favor. *See* Fed. R. Civ. P. 37(e).

On this record, Hampton lacks evidence to support the third element of his claim, and Tes is entitled to summary judgment.

**3. Arnaldo Hernandez is entitled to summary judgment.**

Hampton seeks injunctive relief against Arnaldo Hernandez. (Dkt. 8 at 2) However, since filing this suit, Hampton has been transferred to federal prison. (*See* Dkt. 63; Dkt. 69) Because he is no longer incarcerated at Anchorage Correctional, an injunction against Hernandez will not redress an injury that can recur. Therefore, Hampton does not have standing to bring a claim for injunctive relief against Hernandez. *See Defenders of Wildlife v. Lujan*, 504 U.S. 555, 561 (1992).

Even if Hampton brought a claim for damages, that claim would fail.[3] As the prison superintendent, Hernandez supervises the prison staff and decides whether to adopt the recommendations following a grievance investigation. Under Section 1983, a supervisor can only be held liable in situations where they were personally involved in the constitutional deprivation or set in motion a series of acts which resulted in the injury. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). This can be shown when the supervisor failed to prevent an action that they should have known would result in a constitutional injury or culpably failed to control their subordinates. *Id.*

In this case, Hampton cannot show that Hernandez made a culpable act or omission. Hampton vaguely asserts that "Hernandez made intentional decisions with respect to [Hampton's] diet under his authority and conditions in the Anchorage Correction Complex West kitchen during the relevant period." (Dkt. 41 at 9) But Hampton does not point to a single deliberate decision or omission by Hernandez. Instead, he simply asserts that Hernandez chose not to act on his grievances. (Dkt. 41 at 9-10)

Hampton also vaguely states that had the defendants "taken reasonable, available measures to abate or reduce" the risk, he "would not have been injured on May 1, 2023, March 12, 2024, or July 31, 2024." (*Id.*) But these claims are both unsupported and clearly contradicted by the record. First, prison employees did not stand idly by when he was served fish. *See Sandoval*, 985 F.3d at 680. Rather, they ensured that Hampton received

---

[3] Hampton's complaint states he is seeking injunctive relief against Hernandez. (Dkt. 8 at 2) However, his complaint only asks for monetary damages but not injunctive relief. (*Id.* at 10) Liberally construing this filing, it includes a claim for damages against Hernandez.

proper medical attention following each incident. (*See* Dkt 41-4 at 2; Dkt. 41-7; Dkt. 39 at 84-85) Second, Hernandez adopted recommendations for new measures to ensure that those incidents would not recur. These included double-checking his trays before sending them out to him and wrapping his trays in plastic wrap to prevent contact with fish. (Dkt. 39 at 70, 83; Dkt. 41-5 at 2)

The record also does not show that the measures taken were inadequate given that it only contains evidence of three incidents which DOC employees corrected.[4] (*See* Dkt. 39 at 84) While Hampton asserts that he has had to return a tray with fish fifty times, he has no evidence about any of the other alleged incidents beyond this assertion. (*Id.* at 53) He also provides no additional detail beyond the fact that he was able to return his tray to get a new one without fish, and that the facilities officers were frustrated with the kitchen staff. (*Id.*) And he admits that he did not grieve these incidents. (*Id.* at 54) Without evidentiary support or supporting details, the additional alleged incidents are insufficient to survive summary judgment. *See Pub'l Clearing House*, 104 F.3d at 1171.

Hampton's cited incidents are insufficient to show that Hernandez acted with deliberate indifference. The uncontested evidence shows that DOC employees working under Hernandez took measures to abate the risk of allergic reactions and provide medical treatment afterwards. Therefore, Hampton does not have sufficient evidence to convince a rational jury that Hernandez culpably failed to supervise his subordinates.

Hernandez is accordingly entitled to summary judgment.

---

[4] A fourth incident is listed on the grievance response, but there are no details about it in the record.

## IV. CONCLUSION

Hampton has failed to provide evidence to support essential elements of his claim against each defendant. Therefore, the motion for summary judgment at Docket 39 is **GRANTED**.

IT IS SO ORDERED.

DATED September 23, 2026, at Anchorage, Alaska.

/s/ *Aaron Christian Peterson*
Aaron Christian Peterson
United States District Judge